Alright, the final case for today's argument is Caribbean and United States Virginia v. Valley Campus Pharmacy. Good morning, your honors, and please the court, my name is Justin Berger. I represent appellant Ani Gharibian, the relator in this False Claims Act case. I will monitor the clock, but I will try to reserve about two minutes of my time for rebuttal. Alright, thank you. This appeal boils down to two issues, materiality and specificity. The district court applied the wrong standard on both issues and on both engaged in improper weighing, discounting, and disregarding detailed factual allegations in the complaint. I'll start with materiality. As to materiality, the district court determined that defendant's falsification of diagnoses, of patient diagnoses, was plausibly material, but that defendant's deception with respect to where they were calling from, their deception that they were calling from the physician's offices, was not plausibly alleged to be material. The district court applied the wrong standard to reach that conclusion, applying a standard of would the government necessarily have denied payment. Instead, what Escobar and the statute tell us is the standard is, is there a natural tendency to influence the payment decision? Would a reasonable person attach importance to the falsity? With respect to the deception about calling from the physician's office, the district court compounded the error of applying the wrong standard by disregarding and weighing our allegations. There are three ways from the complaint that we know that deception was material. First, we look at the requirements themselves. Their language is mandatory. The regulations, the guidance, they all say a prescribing physician. Are you talking now about the claims regarding falsification of patient records or the other claim? I am talking about the other claim, the deception as far as calling from a pharmacy versus calling from the doctor's office. So we know those misrepresentations are material because the regulation, the Medicare regulation itself and all the other guidance that we cite in the complaint, talks about the prescribing physician or the prescriber must provide an oral or supporting statement that the requested prescription drug is medically necessary. And we have to look at the practical and policy reasons behind that. That's what Escobar tells us, that we have to look at whether this is central to the payment decision. Is it closer to the essence of the bargain, or is this a minor and insubstantial technical requirement? That's what Escobar tells us to look at. Here we are talking about prior authorization, and we're talking about drugs. We're talking about prescription drugs. Why is the prior authorization requirement put in place for these prescription drugs? Because some of them are highly addictive, they're dangerous, and they can be extremely costly. So this is an added safeguard, a layer of protection against medically unnecessary prescription drugs. That is a substantive decision that the payers want to hear from the physician on. It's the untainted medical judgment of the prescribing physician or nurse practitioner or physician assistant that the payers want to hear from as far as medical necessity, medical necessity being the core of the entire Medicare payment decision and every other insurance program. Are there allegations specific to these claims that there were actual submissions to a government program? Yes, Your Honor. And, in fact, the district court found with respect to Medicare and federal payers that we did sufficiently allege specific claims. The district court found there were two specific claims, and on that basis found we did sufficiently allege submission of false claims to federal payers. But with respect to our state law claims and with respect to the falsification of diagnoses, the district court found a lack of specificity, and I will turn to that. Going back to materiality. So we know, we look at the core purpose behind the requirement. Second, we look at defendant's deception. We, Escobar tells us that the defendant's belief of materiality can be a factor that we look at when we're looking at materiality. Here we have detailed allegations demonstrating that defendants believe these requirements to be material. Their intentional deception proves that. We're not talking about a few random negligent misrepresentations. We're not talking about them being asked questions and not knowing the answers, so just making something up. We are talking about a top-down, concerted, intentional effort to deceive. We have several pages of detailed allegations regarding that deception based on Relator's two years of employment with the company, and that's at ER 60 and 61. She describes, for example, the specific words they were coached to use and how they were coached to call from phones that could not be traced back to the pharmacy, to never admit they were calling from a physician's office. If they got pressed on that, they were instructed to just hang up the phone and call back later and hope to get a different representative. When they did send things in writing, they used a separate fax machine that had a number that was untraceable back to the pharmacy. This level of deception establishes that the defendants knew these requirements were material. The appellees argue that, well, that conclusion would render the materiality element, they say, meaningless because every misrepresentation would be presumed material by its mere existence. That's not so. Every deliberate, systematic deception would be evidence of materiality, but that's not every False Claims Act case. The False Claims Act also attaches to negligent misrepresentations, reckless conduct. In those types of cases, the government or the Relator would have to prove materiality in some other way. But when you have deceptive conduct, that does tend to show defendants' belief that those requirements were material. And third, we have other government actions. We have the Department of Justice prosecuting multiple other companies for this exact same prior authorization fraud, for posing as the doctor's office, and that's at ER 13 and 14. The district court here weighed those allegations and disregarded them by drawing an inference in defendants' favor. The district court said, well, there was other fraudulent conduct involved in those cases, and essentially inferred that without that other fraudulent conduct, the government would not have cared about the prior authorization fraud. That was an unwarranted inference for the district court to draw, especially at this stage. Those counsel, let me ask you a question. I actually think your better argument deals with the changing the patient diagnoses and falsifying medical records. That's better. I'm not sure why you're really leading with this, but I'd like to ask you the consequence of our ruling, that somehow that violates the basis of KTAM. If we were to issue a ruling that essentially says physicians themselves or nurse practitioners, et cetera, have to be the ones calling the insurer, I mean, that's just almost outrageous. I can't imagine that doctors have too much to do already. Is that really what you're maintaining? Yes, Your Honor, and in fact, that is the common practice. It is burdensome, but it's part of our system. It's part of our health care system. It's designed as a check on expensive health care, and it's carefully designed and put in place for that reason. And doctors and their staff, the doctor's staff, have systems in place to do that. It's quite common. And when you say the doctor's staff, it would then be permissible for the doctor's staff to place the call, with a written statement by the doctor supporting the medical necessity, right? And so why is it material if that same authorization, instead of being phoned to my staff member, comes in from the pharmacy? Because two reasons. The pharmacy is financially interested in that transaction. It's the pharmacy that's going to get paid for that drug. And second of all, it's medical necessity. It's does this patient really need this particular drug, or can they use drug X or Y, or can they do a different therapy? And that's a question only the treating provider can answer. But I'm assuming, for purposes of my question, that the treating provider has given that information to the person who's going to place the call, and has decided, for example, name brand versus generic, et cetera. And that assumption is not in the record here, Your Honor. That's not what was happening. As to the patient diagnoses issue, the district court did find that that was material, but found a lack of specificity on those claims. So I will turn to that now. So as to specificity, the district court applied the wrong standard. The district court insisted on specific patient examples for every theory and every claim, and that's not the standard. This court has repeatedly emphasized that. ABID, Swobin v. UnitedHealthcare, Godecky v. Kinetic Concepts, Rule 9 does not require a set number of examples or any examples at all. With respect to- Well, examples do help in terms of specificity, right? When, what, when, where, why. Let me ask you, with regard to the claim regarding falsifying the patient records, the district court dismissed the First Amendment complaint, and dismissed the Second Amendment complaint that you're on appeal on, and said that the only change that you made between the First Amendment complaint and the Second Amendment complaint was this phone call between the employee and the insurance representative. That's sort of your best example in complying with the district court's order to amend, but I don't think that phone call carries you very far, because it just illustrates that there are multiple and limited set of reasons that can be picked for why this medication was needed. And so, you know, I think the employee, if I recall, tried to pick multiple reasons, and, well, no, that's not the reason. Okay, well, then I'll limit it to this reason. I just don't see that phone call really helping you in any way in curing the deficiency that the district court pointed out for your First Amendment complaint. So can you address that point? Yes, Your Honor. It's our position that the district court erred with respect to the First Amendment complaint, and that we had sufficient allegations even there on this claim. And at ER 70-72, we see our description of the patient's diagnosis falsification. We've got paragraphs and paragraphs where we provide details on specific medications that the pharmacy typically changed the diagnoses codes for the diagnoses because defendants knew certain diagnoses were more likely to get approval than others. We have four or five paragraphs there, different medications, different diagnoses, very specific allegations, not with respect to any particular patient, because our client is no longer at the company and doesn't have access to that information, but enough of specifics. And when we line those paragraphs up against Swobin v. UnitedHealthcare from this circuit, that case is great. It gives us a great litmus test because it takes block quotes straight from the relator's complaint in that case and puts them right in the opinion. And it shows us exactly the level of detail that we need in a health care fraud case to surpass Rule 9. When we line our allegations up, the existing allegations, plus the patient example on the diagnosis misrepresentation claim, we have far more even than the relator had in UnitedHealthcare. You have access to that discovery in the patient medical records, right? No, we received limited, we received documents through the government subpoena, but they were, it was sort of a data dump, a document dump. It was not comprehensive. It did not have every patient record. Not every patient record, I don't mean to suggest that, but among the 300,000 plus documents of discovery in this case, that included patient records as well as the recordings of prior authorization calls. You have that, right? It included some. We don't know what it included or what it did not. That was information that was gathered by the government. We had no involvement in requesting that or gathering that. And, again, it was sporadic, and the records could not be matched up easily with the data. I'd like to resume. You have two minutes. I'll give you two minutes, everybody. Thank you, Your Honor. Thank you. Good morning, and may it please the Court, Jessica Ellsworth on behalf of the appellees. As the district court carefully explained in this case, the relator's complaint had two primary problems. She did not plead materiality as to her claim that the defendants defrauded Medicare by playing an undisclosed or misleading role in initiating prior authorization requests. And, second, she did not plead with particularity any scheme related to falsifying medical diagnoses. Starting with the materiality shortcomings. First, there is no Medicare statute, regulation, or contractual requirement that conditions payment for a claim for a prescription on no one but the prescribing physician initiating a prior authorization request. The parties, in fact, agree that the enrollee, him or herself, can initiate a request, and third parties can initiate prior authorization requests. The complaint refers to in-house staff and outside non-pharmacy contractors initiating prior authorization. You can see that in paragraphs 81 to 83 of the second amended complaint. The parties even agree that pharmacies can request prior authorization if the patient asks a pharmacy to do so. You can see that at page 8 of the opening brief and at paragraph 27 of the second amended complaint. And this is important because the same supposed financial conflict of interest that the relator is arguing constitutes materiality here would be present in those situations where an enrollee asked a pharmacy to complete the process. There's even a CMS form, CMS form 1696, which is cited in the complaint. It's designed to allow an enrollee to designate to a pharmacy or anyone else making this prior authorization request. Second, on materiality. At no point in any of the three complaints in the briefing below or in the briefing in this court has a relator pointed to any facts showing that the government declined to pay for a Medicare prescription based on a pharmacy having called to request a coverage determination, which is what prior authorization is, including any facts where the government declined to pay based on a pharmacy employee making the request on a physician's behalf in a way that implies or misstates whether the caller works in the pharmacy's office. This court's materiality decisions, like the decision below, are crystal clear that you need more than one factor pointing in your favor to find materiality. And here the relator's argument really tries to focus on condition of payment and suggests that there is a condition of payment obligation here. But as I noted, the complaint's own allegations and the relator's statement in their appeal brief undercut that there is any such condition of payment. Even if there were, Escobar said, which was repeated by this court in its U.S. Extral Campy decision, that a misrepresentation cannot be deemed material merely because the government designates compliance with that requirement, a condition of payment. You need something else. You need a demanding and holistic approach that shows what the likely or actual behavior of the recipient of the misrepresentation would have been. That is what the district court did here. Although my friend on the other side argues that the district court applied some sort of outcome determinative test, that's not a fair reading of either of the district court's decisions. The district court cited Escobar. It looked to the various factors that Escobar had identified. It looked to the fact that others besides prescribing physicians can initiate prior authorization requests. And then it looked at very intervened cases that the relator had cited and found that those cases all involved quite different and far more egregious conduct than was at issue here. It included things like fabricating blood test results, double billing, paying unlawful kickbacks in the form of speaker fees in order to get prescriptions to be filled, and false and misleading prior authorization requests that used canned justifications that were inconsistent with the patient's actual medical condition. Quite simply, those intervened cases do not get the relator anywhere towards showing materiality. And I think a comparison by this court to the Campy decision I mentioned, to the Gattachee decision, or to the U.S. Actual Rose decision, which I think are the three primary materiality cases from this circuit, all show that in each of those there was both evidence of a condition of payment, and then there was additional evidence that what was at issue was the very essence of the bargain, and that the government had, in fact, in similar circumstances, sought to recoup funds that had been paid for this type of misrepresentation. These same materiality shortcomings apply to the Medicare allegations, the Medicaid allegations, and the California state law claim. That brings us to the falsification of medical records. On this, there are simply not the level of specificity that this court has required. The allegations add up to six paragraphs of the complaint, paragraphs 128 to paragraphs 134. There's no time period. There's no payer information. There is no examples of phone calls that were made in which this information was conveyed. And simply, it does not amount to particular details of a scheme to submit false claims, coupled with reliable indicia that false claims were submitted. As you pointed out, Judge Winn, their best example is the single paragraph that they added, after having access to hundreds of thousands of pages of documents and tens of thousands of recordings of phone calls. And that paragraph, as the district court, I think, very aptly explained, simply has no evidence of a falsified patient record. Can you address paragraph 130 of the complaint? I think that's probably their strongest argument. And this has to do with the example that they gave. If the prescription was for Revlimid, TNH, and Diplomat, I typically claim the diagnosis was multiple myeloma. I have no idea what any of these diagnoses mean. But per paragraph 130, in TNH's and Diplomat's experience, prior authorization for Revlimid was most likely to be approved when the diagnosis was listed as multiple myeloma. Relator believes that approximately 30% of prescription for Revlimid, TNH, and Diplomat received it were patients who had not been diagnosed with that particular condition. I'm paraphrasing a little bit. But can you explain to me why that's not sufficiently specific? Certainly. I think that the last sentence that Your Honor read that begins, Relator believes, is the starting point for the deficiency. Because in a case where a 9B applies, a relator can certainly make an allegation on information and belief, but needs to provide the underlying basis on which that belief is based. And there is no such underlying information that would explain where this 30% number comes from, how she developed it, why she believes that to be the case. In addition, there's no statement in this paragraph about anything having to do with Medicare or with Medicaid, which is important when this is about submitting false claims to the government. There's no allegation of any phone call or fax that was sent in which information was incorrectly conveyed about any Medicare or Medicaid patient in order to get a coverage determination. And then there's no information that any claim was ultimately paid that was medically inappropriate or that didn't meet the standard that's set for prior authorization for this particular drug. There was a general allegation that T&H and diplomat staff regularly made false or fraudulent statements to government and private insurers, but you're saying that's not sufficiently specific to meet the government program requirement. That's right, Your Honor. And it's important in this Medicare context. In Medicare Part D and Medicare Part B, which are where there is some prescription coverage, are run by PBMs in connection with often Medicare Advantage plans or individual insurers that set their own rules and requirements for how prior authorization has to work in those circumstances, what the requirements are for prior authorization to be granted. And there is simply no information that really connects all of the dots in any way from the relator to a misrepresentation of medical diagnosis information about a prescription for Revlimid, and certainly nothing that links it to an insurance company's requirements for that drug and then to a claim that's submitted for payment on that prescription. Counsel referenced the discovery. I asked him about the 300,000-plus documents that he got in this case, and he said that it was very difficult to sort through a document of sorts. And I don't recall from the record, did they ask for leave to amend below? So they did amend their complaint twice below after receiving these materials. That's how they were able to add them. You're talking about the second amended complaint that's at issue here. Did they ask for leave to amend? They did not ask for further leave to amend, Your Honor. The amendments that were made in response to that information consist of the roughly 11 paragraphs that describe a phone call and then the one paragraph that relates to their falsified medical diagnosis allegations. And those amendments are what they drew from all of the evidence that was turned over to the government as part of its investigation. If there are no further questions. I do have a few questions. Are there any distinctions between what's required to prove the state law claims and the California statute violation that would make those claims distinguishable and survive even if the federal claims do not? I do not believe so, Your Honor, because I think materiality would be the same bar for those claims going forward. And what is your view regarding the anti-kickback statute? Is that something that's been preserved by the appellant? My understanding is that they have not chosen to pursue their anti-kickback arguments on appeal, so it is not on appeal before this court. Those are my questions. Thank you. If you have no further questions, thank you very much, counsel. Thank you, Your Honors. Just a couple of clarifications. First, we did seek leave to amend at the district court level, but based on our review of those sparse materials, all those 300,000 pages, again, it was not discovery material. We did not seek it. It was provided to us by the government. And we don't know what was requested or what was actually provided, but we did the best to amend using those materials that we could. So without remand to reconsider what was already pleaded, we think amending would be essentially futile. With respect to the sufficiency of the allegations, again, Swobin starting at 1181, Swobin v. UnitedHealthcare, takes a block quote from the relator's complaint and says this is sufficient. And if we line up this paragraph from Swobin against what we've alleged here with respect to both schemes, we have more detail than what was there. We meet the twin purposes of Rule 9, which are to give defendants notice so that they can mount a defense and to ensure that we're not just guessing here, we're not just making this scheme up, and we're not based on the detailed allegations in the complaint relator's time there. With respect to falsifying where they were calling from, the physician's office, that is critical. This is not just a technicality. This is a coverage determination. Counsel, can I ask you a specific question? Because I just want to make sure I didn't miss anything in the record. With regard to your claim that employees falsify patient records that obtain prior authorizations, the district court found that there was insufficient pleading allegations as to submission to government payers. And I did see one paragraph referencing false and fraudulent statements that government and private insurers would make any other allegations in the complaint. That's the only one that we could see from the complaint. We have allegations throughout the complaint that this scheme, both schemes, involved all payers. They didn't discriminate Medicaid, Medicare. My question is, this generalized allegation of submission to government and private insurers, that's the gist of your allegation regarding submission to government payers. Is that correct? Yes, and the examples that we provide of specific patients have both private insurers and government payers involved. And so, third, I would draw the court's attention to Bodecki versus Kinetic concepts on the issue of materiality. In that case, it was a very technical requirement that the company had to have in their possession, before they distributed equipment, a written signed order from the physician. And if they didn't have that in hand, payment denied materiality, even if there existed a valid doctor's order, even if they had that valid doctor's order before they billed Medicare. This court said, this is an important safeguard that was put in place. And so, at this stage, you've adequately alleged materiality. This requirement, that the prior authorization requests come from the physician's office, is an equivalent safeguard to taxpayer money. All right. Thank you very much. Thank you. Both sides had helpful arguments this morning. This matter is submitted, and we are in recess for the day. Thank you. All rise.
judges: TASHIMA, NGUYEN, Fitzwater